# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

ANTHONY D. NICHOLSON,           )
                                   )

      **Plaintiff,**                )

                                   )

                                 )      **Case No. 3:11-cv-0355**

                                 )      **Judge Trauger**

**v.**                               )

                                 )

**CITY OF CLARKSVILLE,**       )

                                 )

      **Defendant.**             )

## MEMORANDUM

Pending before the court is the defendant's Motion for Summary Judgment (Docket No. 28), to which the plaintiff has responded (Docket No. 37), and the defendant has filed a reply (Docket No. 41). For the reasons discussed herein, the defendant's motion will be granted.

## FACTUAL BACKGROUND

The plaintiff, an African American male, was employed by the defendant, City of Clarksville, as a maintenance worker within the city's Department of Parks and Recreation ("the department") from December 2004 until his termination sometime in 2011.[1] In this action, the plaintiff alleges that he experienced several incidents of racial discrimination throughout the course of his employment. He specifically alleges that the defendant is liable for: (1) creating a

---

[1] Unless otherwise noted, the facts are drawn from the defendant's statement of undisputed material facts (Docket No. 30), the plaintiff's responses thereto (Docket No. 38), the plaintiff's statement of undisputed material facts (Docket No. 39), the defendant's responses thereto (Docket No. 42), and related exhibits. The court draws all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Brown v. United States*, 583 F.3d 916, 919 (6th Cir. 2009).

1

racially hostile work environment; (2) failing to promote him on two separate occasions in 2009; and (3) retaliating against him for objecting to racial discrimination in the workplace. (*See* Docket No. 10.)

## I.    Cussing and Racial Slurs

During the course of his employment, the plaintiff alleges that he and other African American employees were "cussed at" by white employees who escaped discipline for their actions. Such "cussing" included being told to "Get your ass out here" or "Get your ass back to work." It also included being asked "What the hell [are] you doing?" On top of these cussing incidents, the plaintiff also alleges that he witnessed white employees utter racial slurs in the workplace.[2]

For instance, in 2005, a white assistant director employed by the defendant arrived at a location where the plaintiff and other employees were working and informed the group that, if they did not complete their work, "[t]heir asses were fired." Among the employees in this group was Gary Harp, a white male. The plaintiff was not fired or otherwise disciplined following this event.

_____

[2] In addition to those incidents of which he became aware during the course of his employment, the plaintiff, in asserting his hostile work environment claim, also attempts to rely on other incidents involving cussing or the use of racial slurs of which he lacked any such awareness prior to the commencement of this litigation. However, the Sixth Circuit has noted that its case law "makes clear that [it] may consider evidence of other acts of harassment *of which a plaintiff becomes aware during the period [of] his or her employment*, even if the other acts were directed at others and occurred outside of the plaintiff's presence." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 335 (6th Cir. 2008) (emphasis added). Accordingly, in reciting the factual background, the court will only consider those alleged acts of harassment of which the plaintiff became aware during the course of his employment.

2

In 2007, James Clark, a white supervisor, cussed at the plaintiff after he and a white employee returned late from lunch. According to the plaintiff, Clark told him to "get your ass out and work." The plaintiff added that, "later, James apologized, and we was [sic] okay about it." The plaintiff received a written reprimand for this incident, which noted that, when the plaintiff was asked to return to work more than ten minutes following the conclusion of his lunch break, "he replied 'who the hell are you talking to' and proceeded arguing." The plaintiff asserts that the white employee accompanying him back from lunch was not similarly disciplined for being tardy.

During the same year, the plaintiff witnessed a white employee, Dutch Crotty, call a white female employee a "n * * * * * lover." The plaintiff also learned that Donald Carney, an African American seasonal employee, was cussed by James Crotty, a white Maintenance Director who also happened to be Dutch Crotty's brother, after Carney reported the incident involving the racial slur to the Human Resources office. Dutch Crotty was suspended for using the slur.[3]

The plaintiff also witnessed two other incidents in 2007. The first involved a white employee, John Walk, cussing an African American employee, Marlon Matthews. However, aside from recalling the fact that the cussing incident involved the topic of work, the plaintiff does not remember any specific details regarding what Walk said to Matthews. Matthews testified that he and Walk were good friends, visited each other's homes, and joked around with one another. In the second incident, James Crotty called Derrick Willis, a former African American employee, "blue," which the plaintiff understood to be a racial slur referring to the

---

[3] Both James and Dutch Crotty were terminated from their employment in November 2008 due to their handling of proceeds received in a particular sale of scrap metal.

3

darkness of one's skin.[4]  Crotty also cussed the plaintiff at a city park sometime in 2008, although the plaintiff does not recall the details of what Crotty said to him.

In addition to these incidents, the plaintiff also recalled an episode in 2009 at the city's Greenway Trail, where he was cussed by Orville Sykes, a white supervisor employed by the City of Clarksville Street Department.  At the time, the plaintiff was cutting down a tree with a chainsaw when Sykes proceeded to tell him "boy[,] you don't know what you doing [sic]," and "get your ass out of here."  Sykes then went on to, in the plaintiff's words, give him a "verbal resume" regarding his experience and knowledge in tree cutting, after which the plaintiff turned off his chainsaw and handed it to Sykes to allow him to finish the job.  Sykes then proceeded to demand that the other employees present at the scene provide him with the plaintiff's name and asked "what's his name; what's his fucking name."  The plaintiff testified that he didn't respond to Sykes' demands because Sykes never directly asked him for his name.

The plaintiff was subsequently called into the office of Kevin Cowling, Manager of Operations and Planning for the department, and told that it was disrespectful of him to turn off his chainsaw and hand it over to Sykes.  He then received a verbal reprimand for refusing to give Sykes his name.  The plaintiff disagreed with Cowling's assessment, refused to sign the written counseling form evidencing the verbal reprimand, and asked who he needed to speak with in connection with the reprimand.  Cowling then advised the plaintiff that he would take care of things, after which point the plaintiff did not hear anything else about the reprimand.  After the incident with Sykes, the plaintiff was transferred to work at the fairgrounds.

---

[4] Kevin Cowling, a white male who serves as the Manager of Operations and Planning for the department, also testified at his deposition that he understood the word "blue" to be a racial slur referring to the darkness of one's skin tone.

4

Finally, the plaintiff recalls an incident in which he was riding in a truck with a white employee who kept saying n * * * * * along with the lyrics of a song playing on the stereo containing the same word. The plaintiff told the white employee to stop using that word around him, and the employee did so. For his part, the plaintiff subsequently stayed away from that employee. Later, he heard that this particular employee again uttered the same racial slur.

## II.     Other Incidents Allegedly Creating a Racially Hostile Work Environment

In addition to cussing and racial slurs, the plaintiff alleges that other incidents helped create racially hostile conditions at the department. For instance, the plaintiff alleges that a work crew dispatched to a city park was racially segregated. He testified at his deposition that African American employees worked on the softball fields, while white employees worked on the soccer fields. The plaintiff complained about this alleged segregation to Cowling, Richard Davis, who was his supervisor, James Crotty, and an individual named Tina, who was an Athletic Director at the time. While the plaintiff alleges that, after he made this complaint, he was told by Davis to mind his own business, it is undisputed that other supervisors within the department investigated the plaintiff's complaint. For instance, Maintenance Director Gary Harp spoke with the plaintiff and other maintenance workers to determine whether they felt that their work crew was racially segregated. The plaintiff and other maintenance workers each told Harp that workers chose their own work areas based on the tasks they wanted to perform and the individuals with whom they wanted to work, and that work assignments were not made on the basis of race. Cowling and David Robinson, the former Superintendent of Operations with the department, also spoke with the plaintiff and two African American crew members and directly asked them whether they felt their work crew was racially segregated. All three individuals responded no.

5

In 2008, the plaintiff witnessed a white employee, Charles Moody, kick an African American employee, Mose Garrett, in the rear end. James Clark also saw this incident and laughed when it occurred. The plaintiff later heard Moody explain that he "was just playing with the guy." At his deposition, Garrett testified that Moody later apologized to him on three or four occasions and that he believed that Moody's apology was sincere. He also testified that such an incident has not happened again.

Later, in November 2008, the plaintiff saw a noose hanging in a tree at a city park. This noose was also spotted by other individuals, including Clark and Cowling. According to the plaintiff, Cowling cut the noose down from the tree after it was found. On an earlier date, Marlon Matthews found a noose on the rear view mirror of a city-owned vehicle he was operating. Matthews took a photo of the noose and reported the incident to his supervisor, James Crotty. In response to these incidents, three investigations were launched. Derrick Oliver, an African American park ranger employed by the department, conducted an investigation into the matter. Bronson Gibbs, a Risk Manager employed by the City of Clarksville, performed a separate investigation, which, among other things, included an interview of the plaintiff. Moreover, at the defendant's request, the Tennessee Bureau of Investigation ("TBI") conducted its own investigation into the noose incidents. Nevertheless, none of these investigations identified any individuals involved in placing the nooses in the city park or truck. Following these investigations, and upon Oliver's recommendation, the defendant provided a training session in February 2009 for all department employees entitled "Diversity and You."

III.     **Denial of Promotions**

6

In May and again in October 2009, the plaintiff applied for openings in the department for a Maintenance Worker II ("M2") position. This position would have constituted a promotion for the plaintiff, who, at the time, held the title of Maintenance Worker I ("M1"). Four individuals - Gary Harp, James Clark, Richard Davis, and Wayne Masterson[5] - performed the initial screening and interviews of applicants for both of these positions. After completing this process, the panel recommended a candidate to Kevin Cowling for his approval. Once Cowling granted his approval, he forwarded the candidate's application to the Department Director for final sign-off. Applicants for the M2 position were evaluated based on their level of experience, ability to perform the job, ability to work well with others, and work history.

While the plaintiff was interviewed for the opening posted in May 2009, he ultimately was not selected for the position. He failed to make the interview stage for the M2 opening posted in October of the same year. Each of the M2 openings was filled with a white candidate. One of the candidates, David Griffey, was a department employee, while the other, Joel Martin, was an external hire.

In reaching its promotion decisions, the defendant maintains that it determined that the plaintiff was not the best qualified candidate for either of the M2 openings, as he lacked the requisite skills for the position, including welding and plumbing skills. For instance, the defendant notes that the plaintiff was given an opportunity to show his welding skills by repairing a broken gate at the fairgrounds. According to the defendant, the plaintiff attempted to weld the gate twice over a two-day period, but he was ultimately unsuccessful in completing the repair. In contrast, Marlon Matthews subsequently repaired the same gate in a short period of time. The

_____

[5] Clark, Davis, and Masterson each held the title of Crew Chief.

defendant also notes that the plaintiff was given an opportunity to demonstrate his plumbing skills by repairing a faucet. However, although the plaintiff dismantled the fixture, he was unable to repair or properly reassemble it.

For his part, the plaintiff disputes the defendant's characterization of his welding and plumbing skills. At his deposition, he testified that he had successfully welded grills at the fairgrounds in the past. In addition, he testified that, contrary to the defendant's contentions otherwise, he successfully repaired the broken gate at the fairgrounds on two separate occasions over the aforementioned two-day period. Notwithstanding this testimony, it is undisputed that the gate at the fairgrounds fell to the ground after his first repair. According to the plaintiff, the gate was still standing after he made his second repair.

In addition to lacking the requisite skills for the M2 position, the defendant also submits that the plaintiff: (1) was an average, yet inconsistent worker; (2) was argumentative and resisted directives and instructions from his supervisors; and (3) had frequent conflicts or altercations with his coworkers. The plaintiff does not dispute any of these assessments. In sum, the defendant determined that Griffey and Martin, the two white candidates selected for the promotions, were the most qualified from the pool of eligible applicants based on their level of experience, ability to do the job, ability to work well with others, and work history.

The plaintiff disputes that Griffey and Martin were more qualified than he. He also suggests that Griffey, who was the stepson of Richard Davis, the plaintiff's supervisor, may have been hired as a result of departmental nepotism. According to the plaintiff, he complained to Cowling, Harp, and Clark about being passed over for the aforementioned promotions. He asserts that he was advised that he did not receive either of the promotions because he had high blood pressure and lacked a valid commercial driver's license.

8

While the plaintiff alleges that he was denied a promotion on the basis of his race, he does not dispute that other African American maintenance workers within the department, including himself, received promotions during the course of his employment.[6]  For instance, Matthews was promoted from an M1 to an M2 position.  In addition, William Humphrey was promoted from his M1 position to the title of Department Crew Chief, which was a supervisory position.

## IV.    Retaliation

The plaintiff also alleges that the defendant retaliated against him for complaining about discrimination in the making of promotions and distribution of work assignments.  According to the plaintiff, this retaliatory activity began when the plaintiff was moved to a work assignment at a city park in 2007.  His supervisor, Richard Davis, informed him that James Crotty, the Maintenance Director, told Davis to work the "shit" out of the plaintiff so that he would end up quitting his employment.  Davis also informed the plaintiff that the department hired a man named Bill, on a part-time basis, to watch the plaintiff and discover any information that could be used against him.

Later, in 2008, James Crotty moved the plaintiff from his assignment at the city park to work the trash truck.  This move was accompanied by a corresponding increase in the plaintiff's work hours.  The plaintiff believed that this move was a calculated attempt by Crotty to break him down and force him to quit his employment.  All told, the plaintiff's rotation on the trash truck lasted between two and three weeks and included some weekend work.  While working on the trash truck, the plaintiff was accompanied by two other employees who also worked weekends.  During his trash truck assignment, the plaintiff alleges that, unlike some other drivers

---

[6] It is undisputed that the plaintiff began his employment with the defendant as a part-time seasonal employee, but was then promoted to the full-time M1 position.

9

on the trash truck, he was required to work a full eight-hour shift and log his work hours. He also adds that drivers prior to his shift only worked four hours, while receiving compensation for a full eight-hour shift. According to the plaintiff, James Crotty informed him that he was monitoring the plaintiff by video surveillance to ensure that the plaintiff was indeed working his full eight-hour shift.

The plaintiff also cites the defendant's conduct in connection with his September 2010 performance evaluation as an example of its retaliatory activity. When completing this evaluation, Davis initially found that the plaintiff met expectations with respect to metrics that measured his relationships with supervisors and other employees. However, following a conversation with Kevin Cowling concerning the need to provide accurate evaluations, Davis subsequently lowered his assessment with respect to these specific metrics to "unsatisfactory." Cowling doubted the accuracy of Davis' initial evaluation because Davis had previously told him on several occasions that the plaintiff had issues communicating and willingly performing assigned tasks. According to Cowling, Davis often sought to protect his work staff and avoid conflict.

## V. Procedural Background

The plaintiff commenced this action on April 13, 2011, alleging federal and state law claims for discrimination. (Docket No. 1.) He filed an Amended Complaint on July 21, 2011, which asserted claims under 42 U.S.C. §§ 1981 and 1983, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et seq.* (2011). (Docket No. 10.) On August 12, 2011, the defendant filed a Partial Motion for Judgment on the Pleadings and to Stay Discovery. (Docket No. 12.) In that motion, the defendant sought dismissal of the plaintiff's § 1983 and THRA claims in their

10

entirety, as well as dismissal of certain aspects of his Title VII claims. (*Id.*) On October 5, 2011, the court issued a Memorandum and Order that dismissed the § 1983 and THRA claims in their entirety and also dismissed the plaintiff's Title VII failure to promote claim to the extent that it was premised on discrete acts that were outside the relevant statute of limitations period. (Docket No. 23.) The defendant filed the present motion on July 2, 2012. (Docket No. 28.)

## ANALYSIS

### I.    Standard of Review

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue

11

of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## II.     The Defendant's Motion

The defendant contends that it is entitled to summary judgment on all of the remaining claims asserted in the plaintiff's Amended Complaint. Specifically, it contends that the plaintiff's hostile work environment, failure to promote, and retaliation claims brought under Title VII and 42 U.S.C. § 1981 should be dismissed.

### A.     Racially Hostile Work Environment

In order to succeed on a racially hostile work environment claim, a plaintiff must show that (1) he was a member of a protected class; (2) he was subjected to unwelcome harassment; "(3) the harassment was based on race; (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment; and (5) the defendant knew or should have known about the harassment and failed to act." *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011).[7] The harassment must satisfy an objective and a subjective test, meaning that it "must be so severe or pervasive as to constitute a hostile or abusive working environment both to [a] reasonable person and the actual victim." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006).

In determining whether the harassment was sufficiently severe or pervasive, a court must consider the totality of the circumstances. *Randolph*, 453 F.3d at 733. The court may consider a number of factors in assessing whether a hostile work environment exists, including: "the

_____

[7] The court reviews the plaintiff's 42 U.S.C. § 1981 claims for race discrimination under the same standards used to review claims for race discrimination brought under Title VII. *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999).

12

frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citations omitted) (quoting *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 82 (1998)). Indeed, discriminatory conduct must be extreme to constitute a change in the terms and conditions of employment. *Id.*

In seeking summary judgment as to this claim, the defendant contends that the plaintiff has not produced evidence demonstrating that he was subjected to severe or pervasive harassment on account of his race. (Docket No. 29, at 18.) It also contends that, even if such harassment was sufficiently severe or pervasive, the plaintiff has failed to adduce evidence demonstrating that the defendant knew or should have known about the harassment, yet failed to act. (*Id.*) In his opposition brief, the plaintiff argues that, viewing all of the actions taken against him and other African American employees at the department in their totality, a reasonable jury could conclude that the plaintiff suffered harassment that was sufficiently severe or pervasive to alter the conditions of his employment. (Docket No. 37, at 13-16.)

It is undisputed that eight incidents involving some form of cussing or the use of racial slurs occurred from 2005 through 2009.[8] In 2005, the plaintiff and other co-workers, including a white male, were told by a white supervisor that, if they did not complete their work, [t]heir asses were fired." In 2007, the following incidents occurred: (1) Richard Clark instructed the

_____

[8] Again, in conducting its analysis, the court is only considering those alleged acts of harassment of which the plaintiff became aware during the course of his employment.

13

plaintiff to get his "ass out and work" after returning late from lunch with a white employee; (2) Dutch Crotty called a white female employee a n * * * * * lover;" (3) James Crotty cussed Donald Carney in some unspecified fashion after Carney reported the incident involving Dutch Crotty to the Human Resources office; (4) John Walk cussed Marlon Matthews about the topic of work; and (5) James Crotty called Derrick Willis "blue." Crotty also cussed the plaintiff sometime in 2008 at a city park. Later, in 2009, Orville Sykes called the plaintiff "boy" while telling him that he did not know how to properly cut a tree. In addition to these eight incidents, the plaintiff also recalled an incident where he was riding in a truck with a white employee who kept saying n * * * * * along with the lyrics of a song playing on the stereo. While the employee ceased using this word after the plaintiff confronted him, the plaintiff learned that this employee later used the word around others.

Of these nine incidents, five appear to have involved only the general use of profanity that was not explicitly racial. For instance, the 2005 cussing incident was directed at a group of employees that included a white male. The plaintiff was also unable to recall any specific details of what was said by John Walk or James Crotty during the cussing incidents involving Marlon Matthews, Donald Carney, and himself that transpired in 2007 and 2008. The plaintiff has otherwise failed to adduce any evidence demonstrating that the employee or employees cussed were singled out on account of their race.[9] Of the remaining four incidents where racial slurs were uttered, only two involved the use of slurs directed at the plaintiff.

---

[9] Although the plaintiff alleges that, unlike the white employee accompanying him back from lunch, he received a written reprimand following the 2007 incident with James Clark, it is undisputed that the reprimand noted that the plaintiff was written up not for being tardy, but instead for arguing with his supervisor when asked to return to work. There is no evidence in the record showing that the white employee accompanying the plaintiff similarly resisted directions from his supervisor, yet evaded disciplinary action.

14

In addition to the incidents involving cussing and racial slurs, the plaintiff also presented evidence concerning the following episodes that took place in 2008 to support his hostile work environment claim: (1) his complaints to supervisors about belonging to a racially segregated work crew; (2) the incident where Charles Moody kicked Mose Garrett in the rear end; and (3) the two noose incidents. While it is true that the plaintiff complained about racial segregation in his work crew, it is also undisputed that, upon further investigation of the complaint, the plaintiff, along with his other African American coworkers, informed department supervisors that their work crew was not racially segregated. As for the kicking incident involving Moody and Garrett, it is undisputed that the plaintiff heard Moody explain that he "was just playing with the guy" and that Garrett himself believed that Moody's subsequent apologies with respect to the incident were sincere. The plaintiff has not offered any additional evidence suggesting that Moody's actions were motivated by any particular racial animus he harbored toward African Americans. Finally, as for the two noose incidents, it is undisputed that the discovery of the nooses was reported and investigated. Indeed, it is undisputed that, upon its discovery, Kevin Cowling removed the noose in the city park. Similarly, it is undisputed that Matthews photographed the noose found in the truck he was operating and reported the incident to his supervisor, James Crotty. In response to both of these incidents, three separate investigations were launched to identify the responsible parties.

In sum, from 2005 through 2009, the plaintiff's allegations of discriminatory harassment involved five incidents of general cussing; four incidents involving the explicit use of racial slurs; a complaint of racial segregation that the plaintiff essentially retracted; a kicking incident that, based on this evidentiary record, appears to have been the product of workplace horseplay;

and the discovery of two nooses that prompted immediate responses by the defendant. On top of these incidents, the plaintiff alleged that, on an unspecified date, a coworker repeated the word n-***** in his presence and, at a later date, repeated it in the presence of others. Having considered all of these incidents in the totality of the circumstances of which the plaintiff was aware, the court finds that the plaintiff has failed to create a genuine dispute of material fact as to whether the alleged harassment he suffered was sufficiently severe or pervasive to alter the conditions of his employment.

The plaintiff appears to argue that the facts here are analogous to those present in *Jackson v. Quanex Corp.*, 191 F.3d 647 (6th Cir. 1999). The plaintiff's contention, however, is without merit. In *Jackson*, the Sixth Circuit found that there was a question of fact for the jury on the plaintiff's hostile work environment claim based on, among other things: evidence that supervisors and coworkers routinely used the word n ***** and other racial slurs; supervisors discussed their desire to place stars on their helmets for each minority employee fired; restrooms contained graffiti depicting lynchings along with the phrase "KKK is back;" a door at the west end of the plant at which the plaintiff worked had graffiti containing the phrase "Blacks out back" for at least two years; a group of white employees confronted and accused an African American employee of stealing money and making sexual comments to a white employee in an effort to get him to quit; an African American employee's work shirt contained the words "N ** *** Sucker" written over his name; another African American employee arrived at work to find a crushed salamander on his machine and discovered racist graffiti around his machine over the proceeding week; African American employees were disproportionately disciplined by their supervisors and were treated differently with respect to on-the-job training and advancement

16

opportunities; the plaintiff was physically assaulted by a white coworker; and the same coworker later arrived to work wearing a helmet with a swastika on it. 191 F.3d at 651-55. While the court recognizes that some of the incidents in the instant case were deplorable and bigoted, they were, unlike those in *Jackson*, isolated occurrences that were not so extreme as to alter the conditions of the plaintiff's employment.[10] *See Faragher*, 524 U.S. at 788. Therefore, summary judgment will be granted to the defendant, and the plaintiff's hostile work environment claim will be dismissed.

### B. Failure to Promote

When faced with a motion for summary judgment, "a plaintiff must adduce either direct or circumstantial evidence to prevail on a Title VII" discrimination claim. *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir. 2009) Since the plaintiff has failed to adduce any evidence of direct discrimination on the basis of race, the court will employ the *McDonnell Douglas/Burdine* burden-shifting framework. *See McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802 (1973); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *Upshaw*, 576 F.3d at 584. Initially, the plaintiff must establish a prima facie case of discrimination. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1020-21 (6th Cir. 2000) If a plaintiff establishes a prima facie case, a presumption of discrimination arises, which can then be rebutted by the defendant through the articulation of a legitimate, nondiscriminatory reason for its employment decision. *Id.* at 1021. Once the defendant has articulated such a reason, the burden then shifts back to the plaintiff to show that the defendant's proffered reason is pretextual. *Id.* Throughout the

---

[10] Having found that the plaintiff has failed to adduce evidence creating a genuine dispute of material fact as to whether his work environment was so severe or pervasive so as to alter the conditions of his employment, the court need not address the defendant's alternate contention that there are no grounds to impose employer liability.

17

operation of this burden-shifting framework, "'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Upshaw*, 576 F.3d at 584 (quoting *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004).

The defendant contends that summary judgment as to the plaintiff's failure to promote claim is warranted because the plaintiff has failed to adduce evidence showing that the defendant's legitimate nondiscriminatory reasons for its employment decision were a pretext for racial discrimination.[11] (Docket No. 29, at 16.)  In asserting a legitimate nondiscriminatory reason for its adverse employment action, the defendant's burden is merely one of production, not persuasion, and the court does not make a credibility assessment.  *Upshaw*, 576 F.3d at 585-86.  Here, the defendant asserted the following legitimate nondiscriminatory reasons for not promoting the plaintiff: (1) the plaintiff lacked certain requisite skills, namely welding and plumbing skills, for the M2 position; and (2) the plaintiff was often argumentative and frequently resisted directives from his superiors.  (Docket No. 29, at 16.)  These explanations constitute facially legitimate reasons for not promoting the plaintiff to the M2 position.

In opposing the defendant's motion, the plaintiff contends that the defendant's legitimate nondiscriminatory reasons are a mere pretext for racial discrimination. (Docket No. 37, at 11.)  A

---

[11] In its brief supporting its summary judgment motion, the defendant asserts in a single sentence, without any explanation, that the plaintiff failed to establish a prima facie case of discrimination because he was not qualified for the open M2 positions.  The remainder of the defendant's failure to promote argument focuses on its legitimate nondiscriminatory reasons for not promoting the plaintiff and the issue of pretext.  Because the defendant has not supported its argument concerning the plaintiff's purported lack of a prima facie case and, instead, has focused its efforts on the pretext stage of the burden-shifting framework, the court will similarly direct its analysis to the question of whether the plaintiff has created a genuine dispute of material fact as to pretext.

plaintiff can establish pretext by demonstrating that "(1) the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the challenged conduct], or (3) that they were insufficient to [explain the challenged conduct]." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994); *See also Upshaw*, 576 F.3d at 587. To demonstrate pretext, the plaintiff must adduce "sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that [the defendant] intentionally discriminated against him." *Upshaw*, 576 F.3d at 586 (internal quotation marks and citations omitted).

The plaintiff does not specifically articulate in his opposition brief why the defendant's legitimate nondiscriminatory reasons are pretextual. (*See* Docket No. 37, at 12.) Instead, his argument concerning pretext appears to be based on a number of alleged factual disputes raised in both his brief and response to the defendant's statement of undisputed material facts that, he contends, compel a denial of the defendant's motion. The court will address each of these alleged disputes in turn.

The plaintiff first appears to argue that one of the defendant's legitimate nondiscriminatory reasons has no basis in fact. Specifically, he takes issue with the defendant's assessment that he lacked the requisite welding and plumbing skills for the M2 position. (Docket No. 38, at 13-14.) He asserts that he had successfully welded grills at the fairgrounds in the past and that, contrary to the defendant's contentions otherwise, he successfully repaired a broken gate at the fairgrounds on two separate occasions over a two-day period. (*Id*; Docket No. 31, Ex.1, at 13.) However, despite this testimony, it is undisputed that the gate at the fairgrounds fell to the ground after the plaintiff's first attempted repair and that, following his second attempted repair, Marlon Matthews successfully repaired the gate in a short period of time.

19

Moreover, while the plaintiff asserts that he possessed the requisite plumbing experience, he does not dispute that, when given the opportunity by his employer to do so, he was unable to repair or reassemble a faucet. Even if a reasonable jury could conclude from this evidence that the defendant's proffered explanation for not promoting the plaintiff should be rejected, the plaintiff has nevertheless failed to adduce evidence showing that the defendant's action was motivated by racial animus. *See Upshaw*, 576 F.3d at 587.

The plaintiff similarly takes issue with the defendant's determination that the two white employees hired into the M2 positions possessed greater qualifications than he. (Docket No. 38, at 14.) Nonetheless, the plaintiff has failed to adduce any evidence showing how his qualifications compare to either of the two individuals hired. Instead, he suggests that one of the employees, David Griffey, was hired as a result of departmental nepotism. (*Id.*) However, as the defendant notes, a charge of nepotism, even if substantiated, does not, by itself, demonstrate that the failure to hire the plaintiff was motived by racial animus. *See Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1096 (6th Cir. 1996) ("To hold that favoritism toward friends and relatives is *per se* violative of Title VII would be, in effect, to rewrite federal law.") (quoting *Holder v. City of Raleigh*, 867 F.2d 823, 825-26 (4th Cir. 1989).

The plaintiff also appears to argue that the defendant's legitimate nondiscriminatory reasons were insufficient to explain its decision not to promote him. In addition to the reasons the defendant has already articulated for failing to promote the plaintiff, the plaintiff asserts that the defendant also informed him that he was passed over because he lacked a valid commercial driver's license.[12] (Docket No. 39, at 7.) The plaintiff contends that, while possession of a

---

[12] While the plaintiff also asserts that the defendant informed him that he was passed over because he had high blood pressure (Docket No. 39, at 7), he makes no argument as to whether

commercial driver's license was a required qualification, one of the white males hired by the defendant for the M2 position lacked such a license.  (Docket No. 37, at 12.)  However, it is also undisputed that Matthews, who is African American, also lacked a commercial driver's license at the time of his promotion to the M2 position.  Thus, to the extent that the defendant failed to consistently apply its requirement mandating possession of a commercial driver's license, it did so in such a way that both white and African American employees benefitted.

In addition, the plaintiff asserts, without explanation, that his repeated complaints to supervisors about racial discrimination demonstrate that the defendant's proffered reasons for failing to promote him are pretextual.  (Docket No. 37, at 12.)  As the defendant notes in its reply brief, the only specific incident in which the plaintiff complained about racial discrimination in the workplace concerned his allegation that his work crew was racially segregated.  (Docket No. 41, at 3-4.)  The plaintiff, however, essentially retracted this charge and stated on two separate occasions that his work crew was not segregated.

Finally, the plaintiff contends that the change to his September 2010 performance evaluation also shows that the defendant's proffered reasons were a mere pretext for discrimination.  (Docket No. 37, at 12.)  Yet, the undisputed facts demonstrate that the change to the evaluation was made at Kevin Cowling's behest and that he informed the plaintiff's supervisor, Richard Davis, about the need to submit accurate evaluations.  The plaintiff does not dispute the fact that Davis previously expressed to Cowling that the plaintiff had communication issues and did not want to perform assigned tasks.  Nor does he dispute Cowling's belief that Davis sought to protect his staff and avoid conflict.  Apart from these undisputed facts, the

---

this proffered explanation served as a pretext for unlawful discrimination.

plaintiff has not presented any evidence suggesting that Cowling's instruction to Davis concerning the plaintiff's evaluation was motivated by the plaintiff's race.[13]

In sum, while the plaintiff raises a number of reasons as to why he believes the defendant's proffered explanations are pretextual, he has failed to adduce evidence establishing "that *discrimination* was the real reason for the [defendant's] action." *Upshaw*, 576 F.3d at 587. Significantly, the undisputed record evidence shows that, during the course of the plaintiff's employment, African American maintenance employees (including the plaintiff) received promotions. One of these employees, Marlon Matthews, was promoted to the M2 position, while another, William Humphrey, was promoted to the supervisory position of Department Crew Chief. Accordingly, based on the record before it, the court finds that the plaintiff has failed to raise a genuine dispute of material fact as to whether the defendant's reliance on its two legitimate nondiscriminatory reasons was a pretext for race discrimination. Summary judgment will therefore be granted to the defendant as to the failure to promote claim.

### C.    Retaliation

---

[13] To further support his argument that the defendant's proffered explanations are pretextual, the plaintiff relies on a statement by Gary Harp, advising the plaintiff not to apply for a promotion to an open Department Crew Chief position because he would not receive it. (Docket No. 37, at 12.) However, the defendant has represented in its summary judgment brief that counsel for the parties agreed that, in conducting depositions, they would not delve into factual allegations involving incidents from 2010 concerning the existence of a hostile work environment and the plaintiff's applications for promotion. (Docket No. 29, n.2.) In his opposition brief, the plaintiff fails to respond to this representation. In responding to the plaintiff's statement of undisputed material facts, the defendant noted that Harp's statement concerning the 2010 promotion was not relevant and therefore no response was required. Nonetheless, in its reply brief, the defendant addressed Harp's statement, presumably out of an abundance of caution, and argued that the plaintiff failed to offer any facts showing that Harp made this statement based on the plaintiff's race. (Docket No. 41, at 4.) The court agrees. Indeed, the plaintiff's argument is undermined by his own deposition testimony, in which he stated that William Humphrey, an African American employee, ultimately received the open Department Crew Chief position. (Docket No. 31, Ex.1, at 37-38.)

22

Finally, the defendant argues that it should be granted summary judgment as to the plaintiff's retaliation claim.

To establish a prima facie case of retaliation under Title VII, the plaintiff must show that: (1) he engaged in protected activity; (2) the defendant knew that the plaintiff exercised his civil rights; (3) the defendant took an adverse employment action against the plaintiff; and (4) there was a causal connection between the plaintiff's protected activity and the adverse employment action. *Wasek v. Arrow Energy Servs.*, 682 F.3d 463, 468-69 (6th Cir. 2012). In its motion, the defendant contends that the plaintiff has failed to establish a prima facie case of retaliation and, in any event, has failed to show that its legitimate non-retaliatory reasons for its actions were pretextual. (Docket No. 29, at 19.) In his opposition, the plaintiff, in conclusory fashion, asserts that he has satisfied the first three elements of a prima facie retaliation claim. (Docket No. 37, at 17.) In addition, although he rightly notes that, in order to satisfy the causation element, he must proffer sufficient evidence to raise an inference that his protected activity was the likely reason for the employer's adverse action, *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997), he has offered no argument as to how he has done so in this particular case. Indeed, in arguing against summary judgment on this claim, the plaintiff reproduces, in its entirety, a paragraph from the section of his brief opposing summary judgment as to his failure to promote claim. (Docket No. 37, at 12, 19-20.)

In his opposition papers, the plaintiff identified five incidents that he alleges constituted unlawful retaliation by the defendant. These incidents included: (1) the 2007 statement by Richard Davis, in which he informed the plaintiff that James Crotty had instructed him "to work the shit out of" the plaintiff; (2) the 2007 statement by Davis, in which he informed the plaintiff that the department had hired a man named Bill to watch the plaintiff and discover any

23

information that could be used against him; (3) Crotty's decision to transfer the plaintiff in 2008 to the trash truck for a two-to three-week period, where the plaintiff alleges his conditions of employment were more onerous than those of some other employees on the same assignment; (4) the defendant's failure to promote the plaintiff on two separate occasions in 2009; and (5) the receipt of a negative performance evaluation in September 2010. (*See* Docket No. 37, at 19-20; Docket No. 39, at 2-4.)

With respect to the first three incidents, the court notes that, even if it were to assume that the plaintiff has established the first three elements of the prima facie case, he has nonetheless failed to present sufficient evidence to satisfy the causation element. Indeed, the plaintiff has failed to link any of these three incidents to any alleged protected activity. Upon its own review of the record, the court notes that it is undisputed that the plaintiff complained to his supervisors about belonging to a racially segregated work crew sometime in 2008. The court, however, fails to see how that activity could have served as the basis for the alleged retaliation that transpired in 2007.[14] A similar problem plagues the plaintiff's claim that his transfer to the trash truck in 2008 constituted unlawful retaliation. While it is undisputed that the plaintiff complained about racial

_____

[14] The plaintiff also asserts in his response to the defendant's first set of interrogatories that he complained to James Crotty about racial segregation in his work crew sometime in 2007. (Docket No. 31, Ex. 2, at 6.) Nevertheless, the plaintiff has failed to further specify when in 2007 he made this complaint, let alone assert whether his complaint preceded any alleged retaliatory activity that transpired in 2007.

segregation sometime in 2008,[15] he fails to specify when in 2008 that complaint was made and whether the complaint even preceded his transfer to the trash truck.

The plaintiff has also failed to raise a genuine dispute of material fact with respect to the 2009 denials of promotion. It is undisputed that these promotion opportunities were posted by the defendant in May and October of 2009. Again, while the plaintiff fails to link these adverse actions to any protected activity, the record evidence shows that the plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 27, 2009. Taking the October posting first, the court finds that the filing of the March 27, 2009 EEOC charge, by itself, is insufficient to support a retaliation claim with respect to the defendant's failure to hire the plaintiff for the October 2009 M2 opening. Indeed, the plaintiff filed his EEOC charge more than six months prior to the October posting. *See Cooper v. City of N. Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986) ("The mere fact that Cooper was discharged four months after filing a discrimination claim is insufficient to support an interference [sic] of retaliation."). Moreover, the plaintiff has failed to present any other evidence from which this court could infer that the defendant's decision not to promote him was motivated by his decision to file the earlier charge with the EEOC.

---

[15] To the extent that the plaintiff seeks to link his 2007 complaint concerning racial segregation in his work crew to James Crotty's decision to transfer him to the trash truck in 2008, the plaintiff would still fail to satisfy the causation element. Apart from the fact that the plaintiff engaged in protected activity at some point in time prior to being transferred to the trash truck in 2008, the court, as a result of the plaintiff's failure to further specify when these events occurred, lacks the ability to gauge how much time has elapsed between these two events. However, even leaving these problems aside, the plaintiff has failed to present any evidence from which this court could infer that Crotty's decision to transfer him to the trash truck was motivated by the earlier complaint of racial segregation.

As for the May 2009 M2 posting, the temporal proximity between the protected activity and the adverse action is much closer. Nonetheless, the Sixth Circuit has "cautioned against inferring causation based on temporal proximity alone." *Wasek*, 682 F.3d at 471-72. The plaintiff has failed to present any other evidence from which this court could infer causation. However, even if the court were to infer causation from the temporal proximity alone, the plaintiff's claim would still fail. The defendant has articulated two legitimate non-retaliatory reasons for its decision to deny the plaintiff a promotion to the M2 position: (1) the plaintiff lacked certain requisite skills, namely welding and plumbing skills, for the position; and (2) he was often argumentative and frequently resisted directives from his superiors. The plaintiff has adduced no evidence that discredits either of these reasons or suggests that the defendant's true reason for denying him the promotion was his earlier filing of an EEOC charge. If an adverse employment action "is readily explainable on non-retaliatory grounds that have not been shown to be pretextual, then temporal proximity by itself will not support an inference of retaliatory discrimination." *Jones v. City of Franklin*, 468 F.App'x 557, 563 (6th Cir. 2012).

Finally, the plaintiff's reliance on the September 2010 negative performance evaluation fails to support his retaliation claim. It is undisputed that, after the plaintiff received his initial performance evaluation on September 2, 2010, showing that he met all of his employer's expectations, he received a revised evaluation on September 8, 2010, showing that his performance along two metrics was unsatisfactory. Again, while the plaintiff alleges that the issuance of this revised performance evaluation constituted a retaliatory act, he has failed to link it to any prior exercise of protected activity. The record nonetheless reveals that the plaintiff filed a charge of discrimination with the EEOC on March 24, 2010, approximately five and one-half months prior to the issuance of the negative performance evaluation. Aside from this

26

temporal relationship between the protected activity and the alleged retaliatory act, the plaintiff has proffered no additional evidence bearing on whether the defendant changed his performance evaluation due to his prior EEOC charge.

In any event, the change was prompted by Kevin Cowling, who had reason to doubt that Richard Davis, the plaintiff's supervisor, submitted an accurate evaluation, in light of Davis' prior complaints to Cowling about the plaintiff's work performance. Moreover, Cowling believed that Davis often sought to avoid conflict and protect his staff members. The plaintiff does not dispute any of this evidence. Nor has he adduced any evidence showing that the defendant's non-retaliatory reason for changing his performance evaluation was pretextual.

Accordingly, for all of the foregoing reasons, summary judgment will be granted to the defendant with respect to the plaintiff's retaliation claim.

## CONCLUSION

Based on the foregoing, the defendant's Motion for Summary Judgment (Docket No. 28) will be **GRANTED**.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge